### JAMES v. CAMPBELL.

### CAMPBELL v. JAMES.

### CLEXTON v. CAMPBELL.

1. Norton's reissued letters-patent, dated Oct. 4, 1870, for an improved post-office stamp for printing the post-mark and cancelling the postage-stamp at one blow, are void, by reason of not being for the same invention specified in the original.

2. If letters-patent fully and clearly describe and claim a specific invention, complete in itself, so as not to be inoperative or invalid by reason of a defective or an insufficient specification, a reissue cannot be had for the purpose of expanding and generalizing the claim in order to embrace an invention not specified in the original. *Burr v. Duryee* (1 Wall. 531) reaffirmed.

3. In such case, the court ought not to be required to explore the history of the art to ascertain what the patentee might have claimed: he is bound by his statement describing the invention.

4. A patentee cannot claim in a patent the same thing claimed by him in a prior patent; nor what he omitted to claim in a prior patent in which the invention was described, he not having reserved the right to claim it in a separate patent, and not having seasonably applied therefor.

5. Letters-patent for a machine cannot be reissued for the purpose of claiming the process of operating that class of machines; because, if the claim for

the process is anything more than for the use of the particular machine patented, it is for a different invention. *Powder Company* v. *Powder Works* (98 U. S. 126) reaffirmed.

6. The government of the United States has no right to use a patented invention without compensation to the owner of the patent.

7. *Query,* Can a suit be maintained against an officer of the government for using such an invention solely in its behalf; and must not the claim for compensation be prosecuted in the Court of Claims.

APPEALS from the Circuit Court of the United States for the Southern District of New York.

The facts are fully stated in the opinion of the court.

These cases were argued at the last term. *Mr. Attorney-General Divens* and *Mr. Samuel B. Clarke* appeared for James. *Mr. George H. Williams, Mr. M. P. Norton,* and *Mr. Benjamin F. Butler* appeared for Campbell. *Mr. Edward D. Bettons* appeared for Clexton.

MR. JUSTICE BRADLEY delivered the opinion of the court.

This case is founded on a bill in equity filed by Christopher C. Campbell, the complainant below, against Thomas L. James, United States postmaster in and for the city of New York, to enjoin him from using a certain implement for stamping letters, which the complainant claims to have been patented to one Marcus P. Norton, by letters-patent dated April 14, 1863, and surrendered and reissued on the 23d of August, 1864; and again surrendered and reissued on the 3d of August, 1869, and again, finally, on the 4th of October, 1870. The complainant claims to be assignee of Norton, the patentee. Other persons claiming an interest in the patent were made parties to the suit. The Circuit Court rendered a decree in favor of the complainant, and adjusted the rights of the several parties to the amount of the decree. The defendant, James, appealed. The other parties, not being satisfied with the decree as it affected their mutual interests, also appealed. The case is now before us in all its aspects. Supposing the court below to have had jurisdiction of the case, the first question to be considered will be the liability of the principal defendant, James, to respond for the use of the machine or implement in question.

That the government of the United States when it grants

letters-patent for a new invention or discovery in the arts, confers upon the patentee an exclusive property in the patented invention which cannot be appropriated or used by the government itself, without just compensation, any more than it can appropriate or use without compensation land which has been patented to a private purchaser, we have no doubt. The Constitution gives to Congress power " to promote the progress of science and useful arts by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries," which could not be effected if the government had a reserved right to publish such writings or to use such inventions without the consent of the owner. Many inventions relate to subjects which can only be properly used by the government, such as explosive shells, rams, and submarine batteries to be attached to armed vessels. If it could use such inventions without compensation, the inventors could get no return at all for their discoveries and experiments. It has been the general practice, when inventions have been made which are desirable for government use, either for the government to purchase them from the inventors, and use them as secrets of the proper department; or, if a patent is granted, to pay the patentee a fair compensation for their use. The United States has no such prerogative as that which is claimed by the sovereigns of England, by which it can reserve to itself, either expressly or by implication, a superior dominion and use in that which it grants by letters-patent to those who entitle themselves to such grants. The government of the United States, as well as the citizen, is subject to the Constitution ; and when it grants a patent the grantee is entitled to it as a matter of right, and does not receive it, as was originally supposed to be the case in England, as a matter of grace and favor.

But the mode of obtaining compensation from the United States for the use of an invention, where such use has not been by the consent of the patentee, has never been specifically provided for by any statute. The most proper forum for such a claim is the Court of Claims, if that court has the requisite jurisdiction. As its jurisdiction does not extend to torts, there might be some difficulty, as the law now stands, in prosecuting

in that court a claim for the unauthorized use of a patented invention; although where the tort is waived, and the claim is placed upon the footing of an implied contract, we understand that the court has in several recent instances entertained the jurisdiction. It is true, it overruled such a claim on the original patent in this case, presented in 1867; but, according to more recent holdings, it would probably now take cognizance of the case. The question of its jurisdiction has never been presented for the consideration of this court, and it would be premature for us to determine it now. If the jurisdiction of the Court of Claims should not be finally sustained, the only remedy against the United States, until Congress enlarges the jurisdiction of that court, would be to apply to Congress itself. The course adopted in the present case, of instituting an action against a public officer, who acts only for and in behalf of the government, is open to serious objections. We doubt very much whether such an action can be sustained. It is substantially a suit against the United States itself, which cannot be maintained under the guise of a suit against its officers and agents except in the manner provided by law. We have heretofore expressed our views on this subject in *Carr* v. *United States* (98 U. S. 433), where a judgment in ejectment against a government agent was held to be no estoppel against the government itself.

But as the conclusion which we have reached in this case does not render it necessary to decide this question, we reserve our judgment upon it for a more fitting occasion.

The subject-matter of the patent on which the bill in this case was founded is an implement or stamp for postmarking letters and cancelling revenue and postage stamps. The original patent, dated April 14, 1863, exhibited two stamps connected together by a cross-bar which was attached to a handle; one stamp being intended for printing the post-mark, and the other for cancelling the postage-stamp, — both operations being performed by a single blow. The stamps consisted of small hollow blocks, or cylinders, in which were inserted and fastened the types which produced the impressions desired. In one were placed the lettered types which produced the post-mark, and in the other a single type which blotted or

cancelled the postage-stamp. The patentee, in his specification, described the invention as follows : —

"The nature of my improvements, herein described, consists in the employment and combination of a device for cancelling postage or other stamps by means of wood, cork, or similar material inserted in a tube or recess therein, for the purpose of effacing or blotting such stamps with indelible ink. It also consists in the combination of a cancelling device, having wood, cork, rubber, or any similar material for the type or blotter therein, with any postmarking device so as to blot, cancel, or efface postage-stamps with indelible ink at the same time and operation of post-marking of letters, packets, &c., &c.

"To enable others skilled in the art to which my invention relates to make and use the same, I will here proceed to describe the construction and operation thereof, which is as follows, to wit : I construct the post-marking stamp (D) of any suitable material. (E), Fig. 3, is the mortice or recess of suitable dimensions to receive the type for the month, the day of the month, and the year, around which is the name of the place where used, and is the same as the postmarking device described in my letters-patent, bearing date the sixteenth day of December, 1862, and which is secured to the cross-piece (B) in the same manner and by the same means as described and set forth in the said patent, which is also the case with the cancelling device (C).

"I construct the cancelling stamp or device (C) of any suitable material, of any size required in diameter, and in length to correspond to the postmarking device (D). (F), Fig. 3, is the tube or recess in the device (C) for the purpose of receiving the blotting or cancelling device (G), Figs. 2 and 5, which device is made of wood, cork, rubber, or similar material, so as to closely fit the said tube or recess (F), Fig. 3. The face of this device may contain a plan or form for cancelling with indelible ink, like that shown at Fig. 2, or it may have any plan or form for that purpose thought best to devise or use. This device (G) may project somewhat below the lower end of the said tube (F), as seen at Fig. 5, and may also project below the face of the postmarking or rating device (D), Figs. 2 and 3, and it may be driven out of the said tube or recess by means of a pin or bolt operating through the hole (A), Figs. 3 and 5, for the purpose of repairs, or to replace it by a new one. The said tube or recess (G) may be any size in diameter required or any depth desired. The said cancelling stamp or device (C)

being thus constructed with cork, rubber, or other elastic substance for type or blotter, will receive and hold on the face thereof ink in quantities sufficient to blot or cancel the postage-stamp in such manner as to prevent the possibility of the said postage-stamp being cleansed of the cancelling ink by any chemical or other process, for the said ink would be so effectually put thereon that any attempts to remove it therefrom would entirely destroy the said postage-stamp, and thereby render the same incapable of a second or re-use. The said cork, rubber, or other elastic substance, as aforesaid, will render the said stamp capable of an easy and rapid use, for there being a yielding of the same when the blow is given, the operator will not tire as soon by a constant or continued use of the same as though it were of solid metal, and the same will greatly aid in raising the entire stamp from the paper and postage-stamp when the impression shall have been given by the operator. The said blotter or type can be more easily repaired or replaced by a new one at less expense than if made of solid metal. The said cork, rubber, or other elastic material may extend upward to the said cross-bar (B), and there be connected to the same by a screw or pin-bolt, if desired, which will be the same in effect and in operation.

"Having thus described my invention and improvements in marking and cancelling stamps, what I claim and desire to secure by letters-patent of the United States of America, therein, is: —

"1. The cancelling device (C) with wood, cork, or rubber type or blotter (G) therein, or any device substantially the same, so as to cancel the postage-stamp with indelible ink, substantially as herein described and set forth.

"2. I also claim the cancelling device (C) with wood, cork, or similar material forming the type or blotter (G) therein, in combination with the cross-piece (B), and with the postmarking device (D) substantially as herein described and set forth."

We have given the description and claim in full for the purpose of better comparing it with the reissued patent on which the suit was brought, and which is dated Oct. 4, 1870. It will be seen that the invention claimed is very specific and definite in its character. In the first place, the cancelling device is claimed separately, consisting of a hollow tube, in which is inserted the cancelling type or blotter made of wood, cork, rubber, or other elastic substance. The nature of the substance of which the blotter was to be made is emphasized thus:

" The said cork, rubber, or other elastic substance as aforesaid will render the said stamp capable of an easy and rapid use, for there being a yielding of the same when the blow is given, the operator will not tire as soon by a constant or continued use of the same *as though it were of solid metal*, and the same will greatly aid in raising the entire stamp from the paper and postage-stamp when the impression shall have been given by the operator. The said blotter or type can be more easily repaired or replaced by a new one, at less expense *than if made of solid metal*." It is plain, therefore, that elasticity in the material of which the blotter was to be composed was a distinctive feature of the blotting device thus separately claimed. Besides the advantages referred to in the foregoing extracts, its superior adaptability to hold indelible ink was evidently regarded by the inventor as important. From the facts appearing in the case, it is quite clear that a separate claim of this blotting device could not have been sustained had it not presented these special characteristics; had it not, in fact, contained all the elements it did contain. The patentee himself, as will be more fully seen hereafter, had, shortly before his application for this patent, obtained a patent for a double stamp exactly like the one patented in this, except that the blotter type was made of " steel, or other material which would answer the purpose." Of course he could not claim a blotter of like material in the patent now under consideration. And the record is full of evidence to show that hand-types for stamping letters and other characters with or without the use of ink had long been constructed of almost every kind of material. The general form of the instrument was old. Stamps fastened to what is called a brad-awl handle, adjusted thereto centrally, so as to balance the pressure, was used for seals and other instruments for making impressions of every sort from time immemorial; and hand-stamps of the same general description, having a cylindrical type-holder in place of a seal, made hollow for inserting and holding the type, had long been used in the Post-Office Department. It was not without good cause, therefore, that the separate claim for the cancelling device, as a distinct invention, was confined to an elastic type or blotter enclosed in a hollow tube. In like manner, the combination of devices in

the entire instrument, forming the subject of the second claim, was necessarily specific in its character, being restricted by the special construction of the cancelling device. The specific form of a cross-bar to sustain the type-holder, and balance the effect of the blow or pressure when making the impression, was substantially contained in the common hand-type, long before used for printing names on linen with indelible ink. This instrument consisted of a metallic trough or receiver to hold the type, the bottom of which, at its middle part, was attached to a wooden brad-awl handle. Inserting the types for a post-mark in one end of this device, and the type for blotting the postage-stamp in the other, it would be a complete double stamp like that claimed by Norton, the patentee. The fact that it might require a stronger piece of metal for post-office uses than was required for stamping letters on cloth, or that the type-holder would be better adapted to the purpose by being divided into two compartments, does not detract from the substantial similarity of the instruments. Given the idea of stamping the post-mark and blotting the postage-stamp with one instrument at a single blow, it required but little invention, in view of what was then in common use, to adjust the printing apparatus to the handle by means of a block, shoulder, or cross-bar, or other similar device. The needs and requirements of the instrument would soon be developed, and manifest themselves to any skilled workman in that branch of mechanics.

The evidence does not show to our satisfaction that Norton was by any means the first inventor of a double post-office stamp, so constructed as to make the post-mark and cancel the postage-stamp at one blow. If that fact was important, the burden of proof was on the complainant to show that Norton's invention antedated those of others proven in the cause, of which there were several independent of each other. But there is no satisfactory proof that Norton ever produced, prior to 1862, or, at most, prior to 1861, any other double stamp than one which he patented in 1859. In connection with one C. A. Haskins, he obtained a patent in October, 1857, for a hand-stamp attached to a standard with a projecting arm, and provided with a spring to lift it from the paper automatically, after the blow which made the impression was given. This stamp was an elaborate

and complicated contrivance of wheels and cylinders for arrang-ing and manipulating the types for making letters and figures showing the month and day of the month in the post-mark. It had no hint of any secondary apparatus for effacing a postage-stamp at the same time. But in August, 1859, Norton ob-tained a patent for the use of his assignees, Reynolds and Low, which did contain a device for effacing the postage-stamp. Low seems to have been associated with him in the patent of 1857 in the way of furnishing money, but what was the nature or extent of the assignees' real interest in the patent of 1859 is not made to appear. The application for this patent was dated May 3, 1859, but when filed in the Patent Office is not shown. The principal feature of the stamp described in this patent was also an elaborately contrived device for arranging the types for the letters and figures in the postmarking stamp, something in the same line with that described in the patent of 1857 ; no claim for which, however, was allowed. But to the postmark-ing stamp, which was fixed to the handle in the ordinary way, was attached, on one side, entirely outside of the bearing of the handle, a flat piece of metal to be used as a blotter, for which, in combination with the postmarking stamp, a claim was allowed. It is clear to us that this was the stamp to which Norton alluded, and which he asked to have the privilege of testing in the post-office at Troy, in his letter to the Assistant Postmas-ter-General of the 11th of April, 1859, on which much stress has been laid by the complainants. The letter does not give a description of the stamp he wished to test, but it concludes with these words : " I herewith enclose you an envelope con-taining a post-mark from the stamp on the left, and an erasure upon the stamp made at the same operation of post-mark. As *now* constructed, is believed to work well." This is a clear intimation that what he desired to have tested had been re-cently brought to its existing form. In a former part of the letter he had said : " While the order given by your depart-ment was in force, I was unable, in consequence of sickness, to thoroughly test my stamp. It was used upon about three thousand letters only during that time. I have since made some changes in it which seem to make it a much better thing for the purpose designed. Now I ask the opportunity to test

it without any expense to the government." An order was made by Mr. King, the Assistant Postmaster-General, on the 4th of May, 1859, authorizing the postmaster at Troy to use for postmarking letters at his office for the term of three months " Norton's improved marking stamp." The application for the patent had been prepared and sworn to the day previous to this order, namely, May 3, 1859. In this application the description of the invention commences thus : —

" The nature of my invention consists in constructing, combining, and arranging a hand-stamp, hereinafter described, so as to contain a cylinder with the initials of each and every month in a year, and two other cylinders with figures for the respective days of each and every month ; also a cylinder with figures to represent ten years, more or less as the case may be, which cylinders shall revolve upon the same shaft with each, and within a stationary form of type, and thereby print the month, the day of the month, and the year in connection with each, and each in connection with and at the same time of the printing of the subject-matter upon the aforesaid stationary form of type. It also consists in attaching a blotter, hereinafter described, to the hand-stamp aforesaid, upon one or two sides thereof, for the purpose of cutting, blotting, cancelling, or effacing ' the frank' or postage-stamp, so as to prevent a second use of the same, while at the same time the name of the ' post-office,' the year, the month, and the day of the month is printed upon the envelope and one side of the said frank or postage-stamp, thereby giving a good impression of the same, and prevent undue wear of the said postmarking-stamp in consequence of being used upon the uneven surface made by the said frank or postage-stamp."

Now, if Norton had, as he pretends, invented, as early as 1854, the stamps for which he took out his subsequent patents in 1862 and 1863, it is hardly conceivable that he should have taken out the patents for 1857 and 1859 in the form in which they stand. The fact that he did take them out reduces it almost to a demonstration that he had not invented any such stamps at this time.

It is true he produces a caveat filed by him in 1853, which has, or had, an amendment bearing date " Tinmouth, Vt., Aug. 7, 1854," which amendment contained a full description of

the double stamp as finally exhibited in his patent of 1863, and the reissue thereof. But this amendment was shown to have been surreptitiously introduced by him amongst the papers of the office certainly as late as 1864, ten years after its pretended date. In his examination as a witness in this cause he admitted that he made the paper referred to in the summer of 1864, when his assignees, Shavor and Corse, were applying for a reissue of the original patent now in question; and that it was used in that application; but he pretends that it was a copy of a paper which he made and sent to the Patent Office in 1854. No such original paper, however, has ever been found in the Patent Office, and on a regular charge for the offence of making the surreptitious paper and introducing it amongst the files, he was found guilty in September, 1871, and debarred, by order of the Commissioner of Patents, from further access to the papers of the office.

This amendment caveat, therefore, as well as the testimony of Norton on the subject, may be laid out of view.

A witness by the name of Sherwood, a machinist and model-maker, was examined, who produced a sheet or two of items of account, copied from his books, showing charges against Norton for work on "stamps" in 1857, 1859, 1860, and 1862. There were four items in 1857 under date of May, for certain hours of work, charged thus: "May 8. To three hours, finish stamp." There was a large number of items of similar character in the other years named, particularly in January and March, 1859, and August, September, November, and December, 1862, corresponding, as will be observed, with the times when Norton must have been getting up his models for his different patents. The witness was unable to distinguish the kind of stamps he worked on at these different dates, except that he professed to feel quite sure that the first one would postmark a letter and cancel a stamp thereon at the same time. Describing, on his cross-examination, the stamp which he thus referred to, he says: " It was a dating wheel stamp, the wheels giving the dates, with a die for the office and year in the top of the frame that held it, blotting or cancelling at one end the impression given by a blow on the lever by the hand." Now this description applies aptly to both the stamp patented in

1857 and to that patented in 1859, except that it was the latter only which had the blotting attachment. We think it perfectly apparent that the witness had, by a very natural mental process, confounded the instruments together, and imagined that the blotter was attached to the first instead of the second invention. His examination took place twenty years after the date of the accounts, and he relied solely on his memory as to the character of the articles which he worked upon.

This is really the strongest evidence that can be found in the record affording any ground for the conclusion that Norton ever produced any double stamp at all prior to the one he patented in 1859. The testimony of Mr. King, the former Assistant Postmaster-General, when compared with his own contemporary letters and other circumstances, clearly indicates that he had, quite naturally, confounded the device of one date with that of a later date. Other evidence was relied on, but all of such a loose and indefinite character that no reliance can be placed on it in support of the complainant's theory. And it is quite significant that no stamp of the kind claimed, made at the period in question, was produced in the examination. Had such stamps ever been in existence, it is strange that they should have altogether disappeared.

Now, there is abundant evidence in the record to show that double stamps were conceived of and used before 1859, and that about that time they sprung up spontaneously in various parts of the country. It was but recently that there had been any demand for their construction, since postage-stamps had not been in general use in the country for any long period. They were first authorized to be issued and used by the act of March 3, 1847 c. 63 (9 Stat. 188); but it was optional to use them or not. By the act of March 3, 1851, c. 20, postage on single letters was reduced from five cents to three on being prepaid. 9 Stat. 587. It was not till the passage of the act of March 3, 1855, c. 173, that all postage, except on letters to or from a foreign country, was required to be prepaid. This law first brought postage-stamps into universal use; and, as they must be cancelled, two impressions had to be made on a letter, — one for the ordinary post-mark, giving the place and date of mailing the letter; the other for cancelling or effacing

the postage-stamp. This required two blows and produced double work. But without any great exercise of ingenuity, postmasters and clerks in various places improvised double stamps, generally by screwing, welding, or binding to the side of the common stamp an appendage to serve as a blotter at the same time. This was done by Ezra Miller, at Janesville, Wisconsin, as early as January, 1859, or in 1858; and by General Dix in New York, and one Powers in Buffalo, in the summer of 1860. There is also evidence that a similar appendage for the purpose of stamping a large figure 5, to show the postage due, was invented and used by one Rees in the Philadelphia post-office as early as 1845, when the rates of postage were five and ten cents; and that one Ireland devised and used at the same office a like appendage for cancelling postage-stamps as early as 1853. Other similar devices were referred to in the evidence. The adoption of a more artistic and convenient form of the instrument thus spontaneously originated, as its use was continued and became more imperative, was a matter of course. Norton's particular form and construction of the double stamp, as described in his patent of 1863, was undoubtedly an improvement; but we should expect to find, as we do find, that he was restricted in his claim to the particular form and construction set forth in his specification.

A reference to Norton's application for the original patent in question in this case, a copy of which is in evidence, and which, being preserved of record in the Patent Office, may properly be referred to, shows that the functionaries of that office regarded it important that the instrument sought to be patented should be specialized with particularity. This application was presented to the office on the 5th of January, 1863, and was rejected on the 21st of February. On the 21st of March, 1863, the application was renewed in a letter addressed by Norton to the Commissioner of Patents, and after certain amendments were made to the specification, the patent was allowed to pass. The most important amendment was the insertion of that portion of the specification commencing with the words, " The said cancelling stamp or device (C) being thus constructed with cork, rubber, or other elastic substance for type or blotter," and so on, to the end of the paragraph.

This amendment derives further importance and illustration from the letter of Norton above referred to, in which a renewal of the application was made, and which was dated at the National Hotel, in Washington, March 21, 1863. In that letter the writer says: —

"I do not understand that the device referred to in your letter of the 21st of February last is 'a common ink cancelling stamp, such as has been used for years in our post-offices for blotting and thus cancelling post-office stamps.' The devices to which you undoubtedly refer have always been made of metal entirely or of wood entirely. Wood was found to answer no purpose, because not at all durable, so metal ones were used. *Now this device consists of a barrel or tube, into which wood, cork, rubber, or some such material is inserted, for the purpose of holding an indelible ink in quantities sufficient* to blot the postage-stamp so thoroughly as to prevent the same being washed or cleansed by a chemical mixture and again being used in payment of postage. *This tube or barrel holds firmly the elastic substance therein, and prevents the same from undue wear and exposure. The elastic substance therein being worn out, can again be replaced* at the office where used, thus saving the trouble and expense of returning the same to the gov't contractors for such repairs. *This, therefore, constitutes a new device*, composed of two distinct parts in combination, producing new results, besides blotting the postage-stamp.

"This device being new, its combination with the postmarking device for the purposes set forth in the specification is of course new. Upon these two claims I, therefore, most respectfully ask a patent."

On the same day that this letter was received, according to the memorandum on the file-wrapper, the specification was returned to the applicant to enable him to amend it, and was re-examined on the 26th of March, and favorably passed upon on the 1st of April. No one can read the patent in the light of these contemporary documents, and of the previous history of the stamp, without arriving at the conclusion that, so far as the blotting device was separately concerned, the invention consisted of, and was confined to, a tube containing a type-blotter made of an elastic substance, as contradistinguished

from iron or other hard substance. The iron or steel blotter had been patented in 1862, as already mentioned, and as will be shown more fully hereafter. There was not, there could not have been, any inadvertence or mistake in confining the invention to the combination described and claimed in the patent.

The second claim is merely that of a combination of this specific device with the other parts of the apparatus. As the patentee says, in his letter to the commissioner, "This device being new, its combination with the postmarking device for the purposes set forth in the application is of course new."— In other words, the substantive invention, for which the applicant desired a patent, was the blotting device constructed specifically in the manner and for the purpose described. The addition of the combination claim was for the purpose of possibly securing the combination, if the principal claim should be found to be untenable.

Perhaps we have gone more minutely into the evidence relating to the progressive improvements in this instrument than was necessary to show that the claim of the patent was not more restricted than it should have been. The court ought not to be called upon to explore the entire history of an art in order to ascertain what a patentee might have included in his patent had he been so disposed. If he was the author of any other invention than that which he specifically describes and claims, though he might have asked to have it patented at the same time, and in the same patent, yet if he has not done so, and afterwards desires to secure it, he is bound to make a new and distinct application for that purpose, and make it the subject of a new and different patent. When a patent fully and clearly, without ambiguity or obscurity, describes and claims a specific invention, complete in itself, so that it cannot be said to be inoperative or invalid by reason of a defective or insufficient specification, a reissue cannot be had for the purpose of expanding and generalizing the claim so as to make it embrace an invention not described and specified in the original. It is difficult to express the law on this subject more aptly and forcibly than in the words of Mr. Justice Grier, in the case of *Burr* v. *Duryee* (1 Wall. 531), where, in deliv-

ering the unanimous opinion of the court, he says: "The surrender of valid patents, and the granting of reissued patents thereon, with expanded or equivocal claims, when the original was clearly neither ' inoperative nor invalid,' and whose specification is neither ' defective nor insufficient,' is a great abuse of the privilege granted by the statute, and productive of great injury to the public. This privilege was not given to the patentee or his assignee in order that the patent may be rendered more elastic or expansive, and, therefore, more 'available' for the suppression of all other inventions." Of course, if, by actual inadvertence, accident, or mistake, innocently committed, the claim does not fully assert or define the patentee's right in the invention specified in the patent, a speedy application for its correction, before adverse rights have accrued, may be granted, as we have explained in the recent case of *Miller* v. *Brass Company*, *supra*, p. 350. But where it is apparent on the face of the patent, or by contemporary records, that no such inadvertence, accident, or mistake, as claimed in a reissue of it, could have occurred, an expansion of the claim cannot be allowed or sustained.

Turning now to the reissued patent on which the present suit was brought, which is the third reissue, dated Oct. 4, 1870, we find the invention described as follows:—

"The nature of my said invention and improvements herein contained and described consists in the employment and combination of a device or die used for the more complete and perfect cancellation of postage-stamps or letter-franks by means of soft wood used endwise, or of cork, rubber, *or other suitable material*, whereby such stamp or frank is effaced and cancelled, in and by indelible or other ink, in the manner substantially as herein described and set forth.

"It also consists in the combination of a postage-stamp cancelling device or die, constructed of wood, cork, rubber, *or any suitable material*, with any suitably arranged and constructed postmarking stamp or device, so as to cancel, efface, or destroy the postage-stamp or letter-frank with indelible or any suitable ink at the same time, blow, or operation of the stamp or instrument by which the postmark is given or made upon the letter, envelope, or packet, substantially as herein described and set forth.

"It also consists of the postmarking of letters, envelopes, or packets, and in the cancellation of the postage stamp or stamps thereon, with, in, or by any suitable ink, or similar material, by means of some soft wood used endwise against the postage-stamp, or by the means of cork, rubber, *iron, or steel, or by means of any other suitable material* so combined with the postmarking stamp or instrument as to cancel, efface, or destroy the postage stamp or stamps at one and the same blow or operation of the entire instrument thus constructed for that purpose, whereby to prevent a second or re-use of such postage stamp or stamps."

After some details as to the mode of construction, the specification proceeds: —

"The said cancelling type or die can be easily repaired, or replaced by a new one, whenever desired, and at very little expense; and such cancelling die or type G may extend upward to the said cross-bar B, and there be connected to the same by means of a screw, pin, or small bolt. In *such case there would not be any tube or pipe surrounding said cancelling die or type* G. The operation and effect produced would in such case of construction be the same.

"The said postage-stamp cancelling device, die, or type G may be of any desired distance from the aforesaid postmarking or dating device or stamp D, or it may be securely *fastened to the immediate side* of the said postmarking and dating part or stamp or device D by any convenient and suitable mechanical means.

"The said cancelling die, type, or device G I prefer to use made of cork, as it will hold a much greater quantity of cancelling ink upon and in the lower face thereof, and when it comes in contact with the printed surface of the postage-stamp, such surface will become somewhat and sufficiently broken by means thereof, and thus and thereby inject into or impregnate such broken surface with the said cancelling ink, whereby such postage-stamp, so operated upon and filled with such ink, cannot be sufficiently cleansed by any means as to enable it to be reused, or used a second time, in fraud upon the postal revenue, without immediate detection of the same.

"Soft wood, used endwise, will answer nearly the same purpose. Still, long and continued use after the granting of my said patent, April 14, 1863, has fully proven the superiority of the cork for the cancelling die or type used upon postage-stamps as aforesaid. . . .

" I also construct my said postage-stamp cancelling device, die, or type of *cast iron, steel, or other suitable metal,* substantially as shown at G', Figs. 5 and 6, and which may be secured to the said cross-bar or piece B in like manner as the said tube or cylinder C, Figs. 2 and 4, and which is done either by screw and nut where the same unites with the said cross-bar, or it may there be firmly fastened by means of suitably constructed and arranged pins or rivets, or the same may be soldered to the under side of said cross-bar or piece B, or otherwise attached thereto. . . .

" The *aforesaid metal cancelling device, die, or type* G', Figs. 5 and 6, *may also be fastened or secured to the immediate side of the said postmarking device by any good and sufficient means,* substantially as hereinbefore described and set forth, in reference to the said device C, or tube or cylinder, constructed to receive and contain the said type or die G, Figs. 2, 3, and 4.

" Such metallic device, die, or type may also have upon its lower face or lower surface any suitable configuration deemed best to use for the purpose of cancelling the postage-stamp in, with, or by any suitable ink at the same time, blow, and operation of the instrument or apparatus, as hereinbefore stated and set forth.

" In any and every case the postmarking of the letter, envelope, or packet, and the effacing or cancellation of the postage-stamp or letter-frank thereon representing value, are done at the same time and by the same blow or operation of the said several devices and parts, constructed and combined in the manner and by the means substantially as herein described and set forth.

" Both the postmarking and cancellation of the said postage-stamp are done with indelible or other and suitable ink, used for such cancellation or effacing of the postage-stamp."

Omitting much more of this verbose specification, containing, amongst other things, a dissertation on the supposed advantages and importance of the invention, we add the summary of the patentee's claims, which is as follows : —

" What I claim, and desire to secure by letters-patent of the United States of America, is —

" 1. The postage-stamp cancelling device, cylinder, or tube C, containing a die or type, G, made of cork, wood, *or other suitable material, or any equivalent for said cylinder* or tube C, *or for the said cancelling die* or type G, whereby to efface, cancel, or destroy the postage-stamp with indelible or other ink, in the manner and for the purposes substantially as herein described and set forth.

" 2. The cancelling device, cylinder, or tube C, with cork or wood, or *any substantial equivalent* thereof, forming the die or type G, therein, in combination with the cross-bar or piece B, and with the postmarking device D, substantially as and for the purposes herein described and set forth.

" 3. *The postmarking of letters, envelopes, and packets, and the cancellation of the postage-stamps* thereon with ink, at one and the same blow or operation of the instrument, in the manner and by the means substantially as herein described and set forth.

" 4. *The employment and combination of a postmarking device, with a postage-stamp cancelling device,* both being operated by one and the same handle, for the postmarking of letters, envelopes, or packets, and for the cancellation of the postage-stamps thereon with indelible or other ink, in the manner substantially as herein described and set forth."

By these extracts from the specification, and the summary of claims, it appears perfectly obvious that the patentee has embraced in the reissued patent several matters of supposed invention different from and additional to the invention which formed the subject of the original patent. And it is principally, if not wholly, these new and additional claims which the appellant James, as postmaster of New York, is charged with infringing.

In the first place, a new form of the cancelling device is set forth and claimed, different from that described in the original patent, to wit, a cancelling type or die attached directly to the cross-bar, without any tube or pipe surrounding and holding the same. This is not contemplated or hinted at in the original patent. The latter does suggest, it is true, that " the cork, rubber, or other elastic material may extend upward to the cross-bar, and there be connected to the same by a screw or pin-bolt, if desired ;" but this suggestion had reference to a type enclosed, at the same time, by a surrounding cylinder, which formed the distinctive feature of the invention. The context shows that nothing more was intended by the suggestion than the extension of the type upward through the cylinder and fastening it in a particular way. The thought seems to have occurred to the patentee that it might be an advantage, under some circumstances, in addition to fastening the

type in the cylinder by compression, to extend it through the cylinder and fasten it to the bar to secure it from any danger of falling out of the cylinder by becoming loose. Not a hint was given that the cylinder could be dispensed with. This was an after-thought. The cylinder was clearly and distinctly set forth as a necessary constituent of the device, and an essential element in the combination of which the blotting device consisted.

The bearing which this new feature in the reissued patent has on the case is evinced by the fact that one of the devices used for several years in the post-office, which is complained of as an infringment of the patent, was a naked blotter made of cork, directly attached to the cross-bar, without any enclosing cylinder to support it; also by the fact that the other device used in the post-office during the defendant's term of office consisted of an iron blotter directly attached to the side of the postmarking stamp without any enclosing cylinder.

In our judgment, this addition to the patent was no part of the original invention, and could not lawfully be embraced in the reissue, and that the claim for it is therefore void. It is true that this particular feature is not made the subject of a distinct claim. But it is described as part of the inve tion, and would probably be included in the general and sweeping terms employed in the claims that are made. Regarded as not being a part of the original invention, those claims cannot stand if they are construed to include it: if they are construed so as not to include it, then the use of this form of device by the defendant cannot be adjudged an infringement of the patent.

Another new matter, forming no part of the original invention, but expressly disclaimed in the original patent, is the making of the blotter of cast iron, steel, or other suitable material. The original specification, in various forms of expression, excludes such materials. The words " wood, cork, rubber, or any similar material " have this intention, as shown by the context. A claimed advantage is that " the said cork, rubber, or other elastic substance, as aforesaid, will render the said stamp capable of an easy and rapid use; for there being a yielding of the same when the blow is given, the operator will

not tire as soon by a constant or continued use of the same *as though it were of solid metal.* The said blotter or type can be more easily repaired or replaced by a new one, at less expense, *than if made of solid metal.*" This language amounts to an express disclaimer of solid metal. The merit claimed for the invention was that the elastic materials proposed to be used for the blotter, and the use of which the patent throughout supposes possible by the support received from the surrounding cylinder, were far superior to solid metal and other solid and inelastic substances. How, after this, it could be supposed that the use of solid metal as a material for the type-blotter was included in the invention, and that a claim for it was omitted through inadvertence and mistake, it is difficult to understand. Besides, as already seen, and will be again adverted to, the use of steel or other material that would answer the purpose had already been described and claimed in Norton's patent of 1862. We think that any claim in the reissued patent which can be fairly construed to embrace a blotter made of metal is void, and that the use of such a blotter by the defendant did not afford the patentee or the complainant any just ground of complaint.

In connection with this branch of the subject, it is observable that the patentee has added two new diagrams to his drawings for the purpose of exhibiting and illustrating this new ground of claim. This fact, though not decisive, is strongly corroborative of the conclusion which we have reached on the subject.

The third addition in the reissued patent to the invention described in the original is that of the *process* of stamping letters with a post-mark and cancelling the postage-stamp, at one and the same blow or operation of the instrument, in the manner and by the means described and set forth. Leaving out of view the history of the art prior to the invention claimed by the patentee, what possible pretence can there be for contending that the general process was part of the invention which formed the subject of the original patent? Suppose it be true that Norton was the first inventor of this process, was that process the invention which he sought to secure in the original patent? A patent for a process and a patent

for an implement or a machine are very different things. *Powder Company* v. *Powder Works*, 98 U. S. 126. Where a new process produces a new substance, the invention of the process is the same as the invention of the substance, and a patent for the one may be reissued so as to include both, as was done in the case of Goodyear's vulcanized-rubber patent. But a process, and a machine for applying the process, are not necessarily one and the same invention. They are generally distinct and different. The process or act of making a post-mark and cancelling a postage-stamp by a single blow or operation, as a subject of invention, is a totally different thing in the patent law from a stamp constructed for performing that process. The claim of the process in the present case, however, is not so broad as this. It is for the process or act of stamping letters with a post-mark and cancelling the postage-stamp at one and the same blow or operation of the instrument, *in the manner and by the means described and set forth.* Perhaps this claim amounts to no more than a claim to the exclusive use of the patented instrument or device. If it is anything more, it is for a different invention from that described in the original patent. If it is not for anything more, the question is brought back to the instrument or device itself which forms the subject of the patent, and which has been already considered.

The last claim, to wit, " the employment and combination of a postmarking device with a postage-stamp cancelling device, both being operated by one and the same handle, for the post-marking of letters, envelopes, or packets, and for the cancellation of the postage-stamps thereon with indelible or other ink, in the manner substantially as herein described and set forth," may admit of two constructions. It may either amount to a claim for a combination of any kind of devices for stamping and blotting, or for a combination of the particular devices described in the patent. Inasmuch as these specified devices, as we have already shown, embrace new devices not described in the original patent, the claim is too broad in either of its aspects to be advanced in a reissue of that patent, unless the patentee was really the inventor of the general combination of such devices in a double stamp, and was entitled to add a

claim therefor to such reissue.  We have seen that his original patent was for a specific blotting device, and for the combination of such specific device with a post-stamping device in the same instrument.  Could he, in a reissue of the patent, lawfully make the broad claim of the combination of any and all devices for blotting and post-stamping, at one and the same time, in one and the same instrument?  This would be, it is true, only adding a new claim to his patent, but greatly enlarging its scope and making it to embrace every kind of double stamp that can be conceived.  Did he forget to insert this claim in his original patent? · Was it omitted through accident and mistake?  When we examine his original application, the changes it underwent, the careful exclusions as well as inclusions which it contained, and the particularity of the specific combination which he did claim, could he, after the lapse of more than a year (if we take the date of his first application for a reissue as the time for consideration), be allowed to return to the Patent Office and pretend that he had inadvertently omitted the principal claim of the whole thing?  If he was, or pretended to be, really the inventor of the entire double stamp, did not the patent, on its face, show that the invention was not secured to him, — that it contained no such claim?  And was not this omission obvious on inspection?  The truth is, that when he made his original application, and got his original patent, all the documents show demonstrably that he did not intend it to embrace any such broad invention.  That was not the invention he sought to secure.  Having obtained a patent for his specific device and combination, if he afterwards wished to claim the general combination, and had not already abandoned it by taking a narrower patent, he was bound to make a new application for that purpose.  Patentees · avoid doing this when they can, and seek to embrace additional matters in a reissue, in order to supersede and get possession of the rights which the public, by lapse of time or other cause, have acquired in the mean time.  It is for this very reason that the law does not allow them to take a reissue for anything but the same invention described and claimed in the original patent.

But these broad claims in the reissued patent, if construed according to the latitude in which they are expressed, are void

by reason of embracing inventions which had been patented both in England and in this country prior to the patentee's application for the original patent.

A stamp with a postmarking device and a blotting device combined in one instrument was described in an English patent, dated April 24, 1860, granted to one David G. Berri. As shown in the drawing, the postmarker and blotter were attached to one metallic plate, analogous and equivalent to the cross-bar described in Norton's patent, to the centre of which plate the handle was attached, so that the instrument was equally balanced. The particular object of the patent was to secure a method of hinging the plate containing the types on to the fixed plate to facilitate the insertion and change of the types. But the double stamp is fully exhibited; and the patentee, in the specification, says: "In conclusion to the foregoing description, it may be here necessary to note that my improved date-stamp may be employed, either in connection with the double or obliterating mark, as represented, or separately, in conformity with the usual requirements."

The same combination of postmarker and blotter in one instrument was also exhibited in Norton's own patent of Aug. 9, 1859. As he did not then reserve the process of stamping letters with such an instrument, nor the combination of a postmarker and a blotter, and did not make any simultaneous application therefor, he could not afterwards obtain a patent for such process and combination, but would be restricted to such particular combination or process as might be exhibited in a new device or apparatus.

We have already referred to this patent of 1859, and will here only quote from the specification, to show the construction of the stamp, and the scope which the patentee claimed his invention to possess. He says:—

" *The blotter* (J) is fastened to the frame (B) upon one side thereof by the use of the shaft (D), one end of which passes through the upper part of the said blotter, and which is firmly secured to the said frame by means of the nut (E), or by using it for the nut in place of the said nut (E) as aforesaid. This blotter is then and thereby retained in a fixed and strong position by means of the screw (S) in connection with the said shaft (D), the blotter (J) or nut (E),'

and is for the purpose of cutting, inking, blotting, effacing, and effectually cancelling the frank or postage-stamp, while, at the same time and operation, the name of the post-office, the year, the month, and the day thereof are given upon the envelope or letter at one side of the said frank or postage-stamp, and not upon it as now practised, in order to efface and to cancel it under the operation of stamping, which unduly wears out the marking stamp, gives a bad and unintelligible impression, and is in direct violation of the rules or statute of the Post-Office Department. This·stamp may have another blotter like (J), which shall be upon the opposite side thereof, by the use of which the frank or postage-stamp would be cut, inked, blotted, effaced, and cancelled upon any part of the letter or envelope where it may be placed. One blotter like (J); however, is believed to answer the required purpose. *This blotter (J) may be made of any size or shape, and of any material to answer the end or purpose sought to be obtained.* The face, which receives the ink, and which comes directly upon the frank or postage-stamp, is grooved or cut, thereby leaving various projections, which have a sharp or knife edge sufficient for each to cut entirely through the frank or postage-stamp, but not through the envelope immediately under the same, while at the same time the places thus cut are inked by the same sharp-edged projections or cutters on the face of the said blotter as aforesaid. The said blotter (J) should be made of the best kind of *cast-steel*, and in such shape as not to break any part thereof. The projections upon the face of the said blotter may be kept sharp and in cutting order by filing and sharpening them when dull."

The claim of this patent is as follows:—

"Having thus set forth and described my invention, what I claim and desire to secure by letters-patent of the United States is,—

"The blotter (J), connected or attached to the main part of any 'post-office postmarking stamp' for the purpose of cutting and inking, blotting, and effacing so as to successfully cancel the frank or postage-stamp of any letter or any package at the same time and operation of marking or printing upon such letter or package the name of any post-office, the year, the month, and the day of the month, substantially as and for the purpose herein set forth."

Another patent was taken out by Norton on the 16th of December, 1862, for a double stamp, containing a combination of

the postmarker and blotter and the cross-bar connecting them, and to which they were attached. The drawings attached to this patent exhibit exactly the same form of instrument which is exhibited and described in the drawings and specification of the patent sued on in this case. The blotter, however, instead of being confined to wood, cork, or other elastic material, was proposed to be made of "steel, or other material which will answer the purpose," and to have on its face circular cutters, enclosed in circular rings, to cut the postage-stamp at the same time that it defaced it with ink. The invention is described in the specification as follows:—

"The nature of my improvement consists in so constructing cancelling stamps that the same shall cut the postage-stamp, or any stamp similar thereto, without injury to the contents of the envelope or packet enclosed therein, and at the same time cause a heavy circular mark upon the inside, and one upon the outside of that part of the stamp or letter-frank cancelled by the cutting device, so that said postage-stamp or letter-frank shall readily show cancellation in ink, and when removed from the letter or packet on which the same may have been cancelled it shall be reduced to parts or pieces whereby a second use of the said stamp or frank is thus prevented although it may have been previously cleaned by a chemical or other process.

"It also consists in the employment and combination of a cancelling stamp with a cutting and inking device thereon, with a postmarking or rating stamp, so that the cancelling of the letter frank and the postmarking on the envelope or packet shall be effectually done by the means fully described hereinafter.

"To enable others skilled in the art to which my invention relates to make and use the same, I will here proceed to describe the construction and operation thereof, which is as follows, to wit: I construct the postmarking stamp (D) of steel or any material which will answer the purpose. (G) is the mortice or opening to receive the type for the month, the day of the month, and the year, around which is the name of the place where used. (E) is a screw for the purpose of holding the type in the said openings (G). This stamp is secured or firmly fastened to the block or cross-piece (B), Figs. 1, 2, and 3, by means of the screw (K), which is held in its place by means of the small screw (a), Figs. 1 and 2, which is placed near one side of the said screw (K) so as to prevent the same from becoming loose by reason of turning backwards."

After further directions as to the construction of the cancelling stamp, he adds: —

"The cross-piece (B) is made of iron or steel, and in width the same as the diameter of the said rating and cancelling stamp, and of any thickness required. The said cancelling stamp (*c*) is securely fastened to the said cross-piece (B), and at any desired distance from the said rating stamp (D), as seen at Figs. 1, 2, and 3, and in the same manner as that of the said stamp (D). (H) is a screw-bolt or stem, the lower end of which is screwed into the centre of the said cross-piece (B). The handle (A) is then screwed upon the said bolt or stem (H), and firmly upon the said cross-piece (B), thereby making a strong and reliable joining of the handle to the whole stamp."

The claim in this patent is, first, for the cancelling stamp separately, and, secondly, as follows: —

"I also claim the combination of the cancelling stamp (*c*) and the postmarking or rating stamp (D) with the cross-piece (B), substantially as and for the purposes herein described and set forth."

It is hardly necessary to remark that the patentee could not include in a subsequent patent any invention embraced or described in a prior one granted to himself, any more than he would an invention embraced or described in a prior patent granted to a third person. Indeed, not so well; because he *might* get a patent for an invention before patented to a third person in this country, if he could show that he was the first and original inventor, and if he should have an interference declared.

Now, a mere inspection of the patents referred to above will show that after December, 1862, Norton could not lawfully claim to have a patent for the general process of stamping letters with a post-mark and cancelling stamp at the same time; nor for the general combination of a post-stamper and blotter in one instrument; nor for the combination of a post-stamper and blotter connected by a cross-bar; for all these things, in one or other specific form, were exhibited in these prior patents.

Any such claim, therefore, in the reissued patent of 1870 must be inoperative and void, as well because the thing claimed was anticipated in former patents, as because it would be for a

different invention from that contained and described in the original patent. We may, therefore, dismiss from consideration the third and fourth claims of the reissued patent. If they are to be construed as being broader and claiming more than the original patent, they are void; if to be construed as claiming nothing more, they are simply redundant, because the first and second claims embrace all that was in the original, and more.

The case, then, upon the patent, is narrowed down to the claim of the specific device of the blotter as described and claimed in the original patent; and the combination thereof with the postmarking device in one instrument by means of the cross-bar. This being the case, it will be pertinent next to inquire whether the defendant used that device or combination. If he did not, it is unnecessary to pursue the subject further.

As we have already seen, the cancelling stamp or device, described in the patent, consisted of a cylinder, corresponding in length to the postmarking device, and containing a type of wood, cork, rubber, or other elastic material, slightly projecting therefrom. It does not appear that this device was ever used by the defendant. The stamp used by him until January, 1876, had a blotter of cork, it is true; but it was not the specific device described in the patent, and to which the patent was restricted. The cork was not enclosed in a cylinder as demanded by the patent. It was a naked piece of cork directly attached to the cross-bar by a common wood screw, passing through a hole in the cross-bar, and driven into the cork, firmly holding it to the bar. This device, of course, was different from that which was patented. The only other stamp used by the defendant had a steel blotter, connected with the postmarker by a solid metallic plate or mass of metal, and having no cylinder. Neither of these devices infringed the complainant's patent, construed as we consider it must be in order to have any validity at all.

The decree of the Circuit Court will be reversed, and the cause remanded with directions to dismiss the bill of complaint; and it is

*So ordered.*

MR. JUSTICE MILLER dissenting.

As regards the right to a patent for an invention like this, which can be of use to no one but the government of the United States, and which is, therefore, in effect a contract by the United States that it will not use that which is essential to some of its most important operations without paying to the patentee whatever he may demand for the use of his invention, I have great doubt,—a doubt which it would have been necessary to solve in this case if the majority of the court had believed the patent sued on valid.

In the opinion just delivered they have held that while the original patent to Norton might have been valid for some purposes, the reissued patent is void because it is not for the same invention. In this view I do not concur.

The général post-office and its branches had long been in search of an instrument which by one blow — one strike of the hand — would mark the name of the place where a letter was mailed and the time, and so deface the postage-stamp on the letter as would make it impossible to be used again.

This had been done by the use of a single die, which held the type indicating date, &c., and which was made to cover the stamp also, so that the date obliterated the stamp by covering it. For reasons not necessary to mention this did not answer, and it became desirable to have an instrument which at one stroke defaced the stamp and made beside, but apart from the stamp, the postmark date.

Many attempts to do this had been made with more or less success. Most of them failed because the handle which conveyed the power from the hand of the operator was so placed in regard to these two marking instruments that they did not strike with entire unity, in point of time, on all the space of the letter to be covered by the two instruments. In my opinion the record shows that Norton was the first man to accomplish this result by uniting these two marking instruments by a cross-bar between them, and placing the shank or handle common to them both so precisely in the centre between them on the cross-bar that the stroke brought the type and the obliterating device on to the surface of the paper precisely

level, and with precision as to time, over the space which they were designed to cover.

This, I think, was the principal merit of his invention. Connected with it, however, and essential to it, was his device for obliterating the stamp. In his original patent this is described as a cylinder into which is fastened something which receives the indelible ink used to obliterate the stamp, and which imparts it to the surface of the stamp by the blow or strike already mentioned. This, he said in his original patent, was made of wood, cork, rubber, or other suitable material.

It was discovered, by experience, afterwards that iron was a more suitable material than wood, or cork, or rubber, and in the reissue of the patent, on which this action is founded, iron is mentioned as one of these suitable materials.

I do not think this should invalidate the reissue if the original patent was good. If iron was a suitable material it was covered by the original patent. If better than the materials specifically named, that did not exclude it from the original patent nor make the reissue void.

Nor do I concur in the opinion that the combination of the printing and erasing instrument by a cross-bar and shank or handle, which brought the force employed in the stroke to act equally and simultaneously on all the surface to be impressed, was anticipated by any other patent or any other invention.

It would serve no good end to go into all the testimony with the elaborate care which characterizes the opinion of the court on these disputed points. I therefore content myself with stating the principal points in which I differ with that opinion.