## LUELLEN v. BALDWIN LOCOMOTIVE WORKS.

(District Court, E. D. Pennsylvania. March 6, 1926.)

No. 2771.

1. Courts ⊕⇒449(3)—Remedy for patent infringement in manufacturing goods for United States after July 1, 1918, is by suit against United States in Court of Claims (Act July 1, 1918, amending Act June 25, 1910 [Comp. St. Ann. Supp. 1919, § 9465]).

Remedy for patent infringement in manufacturing goods for United States after passage of Act July 1, 1918, amending Act June 25, 1910 (Comp. St. Ann. Supp. 1919, § 9465), is by suit against United States in Court of Claims.

2. Patents ⊕⇒168(2)—Rule of strict construction held applicable to claims allowed by Patent Office after rejection of broad claims acquiesced in by patentee.

Where patentee did not insist on broad claims of patent, but acquiesced in their rejection by Patent Office, claims accepted come within rule of strict construction of such limitations.

3. Patents ⊕⇒177—Claims of patent for combination of elements should be limited to elements specified.

Where patentee specifies any element as entering into patented combination, he makes such element material to combination, and court cannot declare it immaterial, and hence claims of patent for combination of elements should be restricted to elements specified.

4. Patents ⊕⇒328.

Dawson and Luellen patent, No. 1,244,431, claims 23, 28, 29, 30, 35, 37, and 42, for a system of mobile armament, held not infringed.

In Equity. Patent infringement suit by Lawrence W. Luellen against the Baldwin Locomotive Works. Bill dismissed.

Clinton W. Frontz, of Philadelphia, Pa., and Lindley M. Garrison and Theodore S. Kenyon, both of New York City, for plaintiff.

Francis B. Bracken, of Philadelphia, Pa., and William A. Redding and Worthington Campbell, both of New York City, for defendant.

THOMPSON, District Judge. This is a suit for infringement of letters patent No. 1,244,431, granted October 23, 1917, for a system of mobile armament, upon application filed November 23, 1915, by C. F. Dawson and L. W. Luellen. Before the issuance of the patent, Dawson executed an assignment of all his rights in the patent to Luellen. The bill was filed June 21, 1923, and after answer was filed, on October 10, 1923, Luellen executed an assignment of all his right, title, and interest in and to the letters patent, together with all rights of action, claims, and demands for past infringement, to Luellen Railway Artillery, Incorporated. Thereupon, on November 27, 1923, the Luellen Railway Artillery, Incorporated, with leave of court, filed a bill in the nature of a supplemental bill, setting out the issuing of the patent, the acts of infringement complained of, and the assignment from Luellen, to which the defendant filed its answer January 4, 1924.

The purpose of the invention, as set forth in the specification, may be briefly stated to be a combination providing a means by which heavy armament, consisting of guns of long range and large caliber, may be mobilized by mounting them upon cars adapted for transportation on railroads, and by providing, at any desired point or points upon the railroads to be used for the purpose, gun emplacements constructed of sufficient strength at and alongside of the roadbeds and tracks, to anchor the gun mount upon such prearranged emplacements, so that the gun may be fired from such emplacements, so that the shock and force of recoil in firing will be communicated to the earth through the fixed emplacement, without strain upon the trucks or wheels of the transporting car.

A further purpose of the patent, in order to provide that the highest degree of mobility of the mounted gun may be retained at all times, is thus expressed in the specification: "With our invention it will be seen that guns of the heaviest caliber may be transported from place to place, and may be mounted in firing position in such a way that they are adequately supported, and the shocks of recoil are fully taken care of, and that, at the same time, this may be done without removing the guns or gun mounts from the running gear, or displacing the same from the tracks or roadways. In this way the highest degree of mobility is retained at all times, and the guns, while firmly supported during firing, may be almost instantly shifted from one location to another as conditions may require. Thus no delay is incurred in getting the guns in condition to fire, and at the same time, in case of the necessity for retreat, the guns can be quickly withdrawn to positions of safety. This is a very important consideration, as it permits the artillery to be used effectually up to the last possible moment, without danger of its loss."

In order that this high degree of mobil-

ity may be retained, the specification and drawings of the patent clearly show that the conception in the minds of the inventors was that the car, with the gun mount and gun mounted thereon, should remain intact, without disengagement from the frame or body of the car of its trucks or wheels, and that the running gear of the car should be left without displacement from the railway tracks. The gun is mounted, in the drawings and specification, upon a turntable supported by a platform in the shape of a cradle, upon the central and depressed portion of which the gun rests upon its turntable, and the extensions of the cradle-shaped platforms on the higher elevation are supported, at either end, upon the trucks. A pair of side beams, forming part of this platform construction, "situated in parallel relation at the sides of the carriage, are supported by the upper ends of knuckle joints disposed at opposite ends of the vehicle; the lower arms of the knuckle joints being supported by pivotal means on the trucks." The purpose of the knuckle joints is, through their operation, when bent at the joint, to lower the platform carrying the gun, so that the depressed part of the side beams of the platform will come into engagement with and rest upon I-beams embedded in the concrete of the previously constructed emplacement, while the elevated extensions of the platform continue to rest at each end upon the trucks, and the running gear upon the railroad track.

As stated in the plaintiff's brief, the invention involves the combination of two essential elements:

"(1) Supporting means or foundations adapted to be embedded in the earth under or at the sides of the track at the firing point; and (2) a car carrying heavy ordnance, and adapted to co-operate with the supporting means while still in transportation position over the track, in such a way that the car is anchored in fixed position and the shocks incident to firing are transmitted to the earth through the supporting means, and not through the car running gear.

"Thus the invention provides a gun car that is freely movable from point to point over ordinary railroads, but which, by easy manipulation and without the necessity of removing the gun from the car, or of removing either from position over the track, may be anchored in fixed and rigid relation to supporting means or foundations embedded in the ground, so that in such position the gun is as solidly emplaced as if it were in a permanent fixed fortification. When the gun car of this invention is secured to the foundation, its weight is entirely removed from the rails and from the running gear. It retains its transportation position with respect to the rails and running gear, so that it may readily resume its mobility, but it is otherwise independent of them. No part or component of the firing shocks is transmitted through the running gear to the earth. On the other hand, when the weight of the gun car has been returned to the running gear and tracks, and the supports between the car and the foundation removed, the car is freely mobile as a railroad car, and is independent of the foundation. It may then be moved to a new firing position or transported wherever desired."

The emplacement shown in the drawings and described in the specification is constructed by filling a hollow in the roadbed beneath the track with concrete, in which are embedded the ties for the rails, and also embedded therein in lateral position are I-beams, outside of and parallel with the rails, the upper channels being vacant, and free to receive the rectangular framework of the mobile carriage when the latter is lowered into supporting position, the sides of the carriage being provided with a series of laterally extending bolt brackets, with which swiveled bolts, pivoted to an anchorage secured alongside of the outer side of the I-beams, are arranged to be swung upwardly into position within the slots of the bolt brackets. The swiveled bolts are provided with nuts, and, when they are engaged with the brackets and the nuts tightened, the platform, with the gun mounted thereon, is anchored in position.

No novelty is claimed in any of the constituent elements of the combination, nor in any of the various parts of the mechanism of its construction. With this brief outline of the system of mobile armament, as described in the specification and shown in the drawings of the patent in suit, we will state the acts of the defendant which, it is claimed, constitute infringement.

In the fall of 1917, after the United States had entered the World War, it was known that a great drive on the part of the German army was contemplated for the following year; that preparations were being made to that end; that the Germans were equipped with heavy artillery of large caliber and long range, which would be employed in the drive, while the Allies were not sufficiently equipped with heavy guns of large caliber

to meet the expected German offensive. The United States government, having a number of large caliber, long-range, naval guns, that had been constructed for use upon battleships, which were not yet completed and could not be completed in time to use the guns at sea, determined to take up at once the problem of using this available armament, and thus, by the use of these guns upon land, to place at the disposal of the Allies guns of such power and range as would furnish the Allies with instrumentalities capable of use as a counter offensive for defense against the German attack.

After consideration of various plans offered, and after rejection by the War Department of the use of the patent in suit, authority was given and plans ordered to be prepared for the utilization of these guns mounted upon railway cars, to be fired from fixed emplacements, upon which the guns could be placed in position for effective firing from points on the railways in France, and be readily removable from place to place, so that they would not suffer the disadvantage of guns in fortifications upon fixed emplacements. After preparation of the plans, contracts were entered into with the defendant, the Baldwin Locomotive Works, for the construction of parts to be used with parts supplied by the Navy Department.

In accordance with these contracts, the defendant constructed for the United States government five gun cars, consisting of railway trucks and steel girders, constituting the gun mounts and the steel parts for 12 pit emplacements and foundation lifting jacks. The heavy ordnance, to be mounted upon the cars, consisting of 14-inch caliber guns, and all strictly ordnance parts, were supplied to the defendant by the government. These gun cars, with the foundation parts, and the guns and ordnance parts supplied by the United States, were delivered to the government prior to July 1, 1918, and are the only structures manufactured by the defendant which need be taken under consideration in this suit.

[1] There can be no question that the gun mounts and foundations, or parts thereof that were manufactured by the defendant, after the passage of the Act of July 1, 1918, amending the Act of June 25, 1910 (chapter 114, 40 U. S. Statutes at Lage, 705 [Comp. St. Ann. Supp. 1919, § 9465]), were manufactured for the United States, and therefore the plaintiff's remedy for infringement by manufacture after that date is by suit against the United States in the Court of Claims. Foundation Co. v. Underpinning & Foundation Co. (D. C.) 256 F. 374; Floyd Smith Aerial Equipment Co. v. Irving Air Chute Co. (D. C.) 276 F. 834. None of the parts manufactured by the defendant were, in themselves, patentable. They were all known and practiced in the prior art.

The gun mount and its foundation, as set up and delivered to the United States under the contract, consist of a steel girder which, with some slight modification in form, is similar to that used in mounting heavy guns on battleships, but is sufficiently longer than the navy gun mount to allow for mounting upon railroad trucks. The girder is constructed of two parallel steel plate girders, secured together by transverse braces or struts. This girder is carried upon two transverse beams, each supported by and secured to a 12-wheel truck, one at either end of the girder. Upon this girder the gun is mounted upon its slide and trunnions. To the under part of the side plates or girders is secured a transom plate with a depending pintel. The beams supporting the girder upon the car trucks are detachably secured upon the trucks, so that the girder may be raised by means of jacks from the trucks, when placed in proper position over the emplacement or foundation.

The foundation parts manufactured by the defendant consist of heavy timber and structural steel members, adapted to be placed in a pit excavated under the roadbed and extending beyond the rails on either side thereof. The pit is relatively shallow at the forward end and deep at the rear end, so as to afford space for the breech of the gun when fired from high elevation and for its recoil. The timbers support two structural steel side members, consisting of plates forming the sides of the pit. These side members are united and strengthened by transverse members at the rear or deep end of the pit. A transom bed plate is provided, consisting of a large casting, which extends across the pit and rests upon the side members. It is held in position by lugs, which engage in slots provided in each side member. The transom bed plate is provided with a socket into which the depending pintel of the transom plate fits. The girder carrying the gun is raised from the trucks, when the gun mount is in proper position over the pit, for the pintel, when the transom bed plate is raised by means of screws bearing upon the top of the side members of the foundation, to be received by and fit into the socket in the transom bed plate.

The purpose of the foundation is to act as a support for the gun mount when it is in fixed position, to hold it in position over the pit, to take the stress of the firing and recoil of the gun, and to afford space for the breech of the gun and its recoil. In order to operatively combine the gun mount with the pit and its foundation, it is necessary to remove so much of the beams supporting the rails forming the track as extend across the pit, and as to so much of the pit as is covered by the transom bed plate the latter is provided with grooves in continuance with the rails, so that the forward truck of the gun car can be moved across the pit to place the mount in position after the transom bed plate has been secured to the steel side members of the foundation before the removal of the rail beam and rails.

The removal of the rails and their beams is necessary, in order to permit the breech of the gun, when it is elevated over 15 degrees, to extend into the pit and to provide space for its recoil of 44 inches when fired, as the bottom of the gun carriage, whether on or off the trucks, is brought into such close proximity to the roadbed that it cannot be fired at an elevation greater than 15 degrees, which must be attained when the target is at a distance that cannot be reached at that elevation. It is also necessary to have sufficient lateral space to allow for the training of the gun at an angle of 2½ degrees either way from its normal position. The object of the foundation is not only to provide a support for the girder carrying the gun, when in fixed position, and to hold it in position over the pit, but to take the thrust of the gun through the transom and transom bed plate, and thence through the supporting structural steel members and timbers in the pit to the earth.

It will be seen again that, when firing the gun in its anchored position, the width of the pit being greater than the distance between the rails, it is necessary for the rails to be removed. When the gun is fired at an elevation of 15 degrees or less, it may be used as a sliding mount upon the rails, so that the pit and foundation are no part of a combination necessary when it is intended to fire at that elevation or less. In order to demount the gun girder from the trucks, the defendant's construction supplies jacks of sufficient strength to support at each end of the girder, by means of the cross-girder, the weight of the gun and its mount. By means of these jacks, the gun is raised from its position upon the trucks, and the transom bed plate is raised by means of the screws bearing on the side plates of the pit, so that the pintel in the transom casting engages with the socket of the bed plate. When the gun is in action, the forward jacks are removed, and the rear end of the gun mount is additionally supported by the rear jacks. The gun, with its mount, is thus entirely detached from the trucks of the car, the tracks over the pit have been removed, and the trucks are entirely disassembled from the body—that is, the carrying girder of the car.

Under the contract with the government, all structural ordnance parts, such as gun-breech mechanism, slide complete, deck lugs, elevating gear, transom castings, all elevating gear details, gun-loading devices, consisting of shell car and trolley hoist, and the sighting devices, were furnished by the government; all other parts of the gun car by the contractor. The parts furnished by the defendant were the main girder, with its accessories, consisting of the forward and rear jacking beams, the forward and rear trucks, with the truck girders, and the foundation with its jacks and foundation equipment.

It is not disputed, therefore, that neither the foundation parts, supplied by the defendant, which excluded the transom bed plate, without which the foundation would not be complete, would be operable as a foundation, nor would the gun mount be operable without the parts supplied by the government. The contract provides: "The contractor will also be required to erect and assemble on each gun car the ordnance material which will be manufactured and supplied to him by the government."

In this construction the plaintiff claims infringement of the claims in suit, in that the defendant's pit foundation is "the supporting means or foundation adapted to be embodied in the earth under or at the sides of the track at the firing point," and the defendant's gun car is "a car carrying heavy ordnance and adapted to co-operate with the supporting means while still in transportation position over the track in such a way that the car is anchored in fixed position and the shocks incident to firing are transmitted to the earth through the supporting means and not through the car running gear."

The defense of noninfringement was set up, upon the ground that the claims upon which the plaintiff relies, Nos. 23, 28, 29, 30, 35, 37, and 42 of the patent in suit, must be limited and restricted, because of the prior art and the history of the claims allowed in the Patent Office, as shown by the file wrapper, in such manner that the de-

fendant's construction, even if its manufacture of the parts supplied by it to the government is direct and not contributory infringement, does not come within the limitations of those claims.

In claim 23 the combination of elements is as follows: (a) A railroad; (b) a railroad car, mounting heavy ordnance; (c) a foundation or an emplacement, installed on the roadbed, associated with the railroad and located beneath the car, when the car is in position for ordnance firing; (d) the foundation or emplacement, co-operating with the lower part of the car while the car remains in transportable position on a railroad, incapable of withstanding the shock incident to firing the ordnance.

Claim 42 is for a combination of (a) a railway; (b) a railway car; (c) heavy ordnance mounted on a car; (d) an installed emplacement at the sides of the rail, to support the gun during firing, while the car is maintained in traveling position on the railway.

Claims 28, 29, and 30 each set out as an element of the combination "an ordinary railroad, incapable of resisting the firing strains of heavy ordnance adapted to be transported thereover," and in each of those claims the foundation or emplacement is described in varying terms, as adapted to receive and support the ordnance, and to receive and retain the ordnance carrying car in transportable (in claim 42, "traveling") position, and to resist recoil under firing conditions.

Claim 35 and claim 37 each state, as one of the elements of the combination, "an ordinary railroad incapable of resisting the firing strains of heavy ordnance adapted to be transported thereover." Claim 35 specifies "anchoring means for the car and ordnance intact, constituting a part of the emplacement and serving to retain the car and ordnance in operative position against recoil." And claim 37 includes "means for anchoring the transporting car with its ordnance in firing position on the car, said means comprising a fixed emplacement, operating to relieve said car of strains under firing conditions of the ordnance."

It is contended by the defendant that these claims must be narrowly, and not broadly, construed; that in the defendant's structure the car, when upon the emplacement, is not in transportable or traveling position; that it has not been shown that it has been used in combination with a railroad, such as is described in the claims; that therefore it has not infringed.

It is contended that claims 28, 29, 30, 35, and 37, containing, as an element of the combination, an ordinary railroad, incapable of resisting the firing strains of heavy ordnance adapted to be transported thereover, are limited to the particular kind of railroad thus described, and that, as to these claims, there is no evidence of infringement, for it has not been shown that the railroad, upon which the gun car was mounted at the proving grounds before acceptance by the government, was a railroad of that description, and that the history of the action of the Patent Office, as shown by the file wrapper, is evidence that in these claims the defendant limited its invention to those terms, and that the same rule must be applied to the claims, with the limitation of transportable position of the car, when the gun and its mount are in firing position over the emplacement.

The application, as filed, presented 8 claims, none of which limited the ordnance to be carried as "heavy ordnance," and the first claim alone contained the limitation that the gun was to be transported and brought into co-operation with the fixed base, "without being removed from the mobile gun-carrying support." These claims were extremely broad in scope, embracing inventions covered by prior patents and by the prior art as described in publications. They were rejected upon the Paul and Sock patent, No. 675,-405, of June 4, 1901, and the French patent, No. 181,653, of February 9, 1887, to Chevalier. Thereupon the applicants amended their claims, and added new claims, so that the application contained 12 claims, all of which were rejected, except the seventh, which is not in controversy in this suit. Rejection of these claims was based upon the Paul and Sock patent, and the French patent to Chevalier, above cited, the British patent, No. 6,488 of 1890, to Thomas English, and a publication in the Scientific American of December 20, 1913.

It is unnecessary to go into a minute discussion and consideration of other amendments and rejections, which were made prior to July 25, 1917. By an amendment added on that date, claims 28, 29, 30, 35, and 37 of the patent in suit were amended, by including a limitation of an ordinary railroad incapable of resisting the firing strains of heavy ordnance adapted to be transported thereover, and these claims were then allowed with that amendment.

Claims 23 and 42, which do not include that limitation, do include the limitations of the car remaining in transportable position on the railroad when it is in position for ordnance firing over the emplacement, in

claim 23, and while the car is maintained in traveling position on the railway, in claim 42. It is clear that these limitations were included in the claims to avoid the objection of the patent examiner, based upon the prior art.

In the Chevalier patent it is stated: "The object of this invention is a new slide carriage (chassis-affut) designed to be used both for the transportation of field guns of all calibers on railway tracks of any gauge and for running them in and out while on the track."

The chassis consists of a truck frame, designed to be used at the same time as a gun carriage chassis. It consists of a platform constructed of two steel side beams, reinforced by cross-beams and resting by means of pivots on two trucks. The chassis, on which the gun is mounted, is transported on the railroad, and, when in position for firing, as shown by the drawings and specification, the rear truck is removed. The description and drawings show a supporting emplacement or platform constructed to the right and left of the track to receive the weight of the chassis, when swung around on its swivel mounting on the front truck, and to hold it firmly in firing position and relieve the axles of the truck of the stress of firing. The chassis carries at its front a pivot, which secures it to a socket in the front firing platform. The rear truck is removed and the rear of the chassis is supported by rollers resting upon the traversing circles of the rear platform, but the rollers may be replaced by any other means of support on the ground. Pivoted jacks under the frame of the front truck support the whole weight, without fatigue on the axles.

The Chevalier invention embodies the first of the two essential elements which the plaintiff claims for its patent, namely, supporting means or foundations adapted to be embodied in the earth under or at the sides of the track at the firing point, and also the second essential element, namely, a car carrying heavy ordnance (for the Chevalier patent is for guns of all caliber) and adapted to co-operate with the supporting means while still in transportation position over the track, in such a way that the car is anchored in fixed position and the shocks incident to firing are transmitted to the earth through the supporting means, and not through the car running gear, minus the limitation as to the car "while still in transportation position over the track," and that the necessity and intention of so limiting the claims in suit was in the mind of the applicants is made clear by the

statement accompanying the amendment of August 17, 1917, as follows:

"The amendment above submitted is directed to that general broad feature of the invention disclosed in this application. While the French patent cited illustrated possibly the general thought or conception of a railroad, a portable gun mount, and implacements, there is that lacking feature of prompt transportation. A disassembling of the parts is required in the French suggestion, and the general arrangement is one wherein the entire car body is swung out of position for transportation. By incorporating the term 'fixed emplacements,' or 'installed emplacements,' and by bringing into certain claims the idea of maintaining the car parts in transporting position, the claims clearly differentiate from any suggested prior publication or practice."

The Paul and Sock patent, No. 675,405, of June 4, 1901, is for an apparatus for unlimbering heavy ordnance. The invention is for apparatus for enabling ordnance, which is transported in parts or entire on a field railway vehicle, and is mounted on a wooden or iron base plate, and is rigidly connected thereto, to be easily brought into firing position, and to be again mounted on a field railway vehicle. The apparatus comprises a number of screw spindles, each of which has a nut arranged in the base plate and can be inserted into a foot bearing sunk into the ground at the place desired, so as to enable the base plate to be removed from the field railway vehicle, and, when the latter has been drawn out, enable the base plate to be lowered to the ground. The claims are:

"1. The combination with a gun mount and jackscrews for raising and lowering the same working in suitable nuts in said mount; of foot bearings for said jackscrews to be sunk in the emplacement for the gun, said foot bearings fitting recesses in the gun mount when lowered into position for firing, for the purpose set forth.

"2. The combination of a gun mount, jackscrews working in suitable nuts in said mount for raising and lowering the same, and footbearings for said screws, sunk in the emplacement for the mount and fitting recesses therein when the mount is lowered into firing position; of means for positioning a gun carriage with the gun trunnions above the trunnion bearings of the mount, substantially as and for the purposes set forth."

The drawings show the gun, supported upon its platform or base plate, carried by front and rear trucks upon a railway, with fixed emplacements embodied in the earth at

either side of the railway tracks. Foot bearings are sunk into the ground at the place where the gun is to be brought into firing position, and in the base plate, in corresponding number and position to the foot-bearings, are nuts for receiving screw spindles, which, when screwed in, bear first upon the foot bearings, and, when further rotated, raise the gun on the base plate and gun mounting from the vehicle, so that the latter can be run out from below, and, when subsequently rotated in the opposite direction, allow the base plate to descend to the ground. It will be seen that in this invention the gun support or base plate is lifted, so that the trucks can be removed, and the gun with its support is therefore no longer in transportable position on the railway.

The publication in the Scientific American of December 20, 1913, cited by the examiner, showing "a fort that travels on wheels," describes the Schneider system for a mobile battery running on rails, in which a gun with a caliber of eight inches (admittedly a large caliber gun) is carried upon a cradle-shaped platform supported at either end upon trucks for transportation on an ordinary railway. The gun car is provided with two bogie trucks and a sheet steel platform, lower in the middle than at the ends, in which lower part the eight-inch piece is carried on a central swivel mount. The side members of the platform carry two articulated swinging supports, the outer ends of which carry screw-adjusted base plates, which are employed when the gun is swung around with its longitudinal axis at right angles to the length of the car. These screw-adjusted base plates are fixed upon the ground in the illustrations, in order to take the strain of firing and prevent the overturning of the car. The illustrations show the supporting members with their screw-adjusted base plates resting upon the ground, with the gun at various angles. This publication, representing the Schneider coast defense train, sets out the merits of the Schneider system, covering similar points of merit to those set out in the specification of the patent at suit, and the system is apparently for use upon an ordinary railway. There are stressed in the article the merits of mobility of batteries upon railways, as opposed to batteries upon ramparts of permanent forts, the strategic advantages of secrecy of the plan of defense, better utilization and economy of material, and the advantages of employing the railway for other purposes of transportation in times of war and in times of peace.

[2] In view of the rejection by the Patent Office of the claims which did not contain the limitation of the transportable position of the car, nor that of a railroad incapable of withstanding the strain of gun fire, and the fact that the inventors did not insist upon the broad claims presented, but acquiesced in their rejection by the Patent Office, and accepted claims 23, 28, 29, 30, 35, 37, and 42, as proposed by them and allowed by the Patent Office, they come within the rule of strict construction of such limitations. Judge Buffington thus stated the rule in Yates v. Smith et al. (C. C. A.) 271 F. 33, at page 35:

"The claims he originally made contained no location limitation. They were rejected by reference, inter alia, to the patent of Patterson, No. 128,651. Its subject-matter was a mirror swinging in a stationary frame, and the adjusting mechanism was located on the mirror. Under stress of this reference, and to avoid rejection, Bogenberger canceled, and substituted for his canceled claims, the present ones, which located the adjusting mechanism on the frame. We are not concerned with the question whether this action of the department was right (Vanmanen v. Leonard, 248 F. 939, 161 C. C. A. 57), or whether Bogenberger, by contesting, could justly have obtained a broader claim. The decisive thing is that, whatever contention to the contrary Bogenberger might have made, he did not make it, but himself became the actor, and tendered and accepted claims which restricted him to location limits, namely, on the frame of the window. Such being the condition of claim limitation and the consideration for which his patent issued, it follows that this location limit must be enforced; when he attempts on patent enforcement to expand his claims by emasculating such enforced limitation. For this court to adjudge otherwise would be for us to now in effect, and under the guise of mechanical equivalents, undo the action of the Patent Office and close to the public a field of manufacture which Bogenberger disclaimed, and which the Patent Office forced him to make as a condition of securing his claim."

See, also, Roemer v. Peddie, 10 S. Ct. 98, 99, 132 U. S. 313, 317 (33 L. Ed. 382), where Mr. Justice Blatchford said: "This court has often held that when a patentee, on the rejection of his application, inserts in his specification, in consequence, limitations and restrictions for the purpose of obtaining his patent, he cannot, after he has obtained it, claim that it shall be construed as it would have been construed if such limitations and restrictions were not contained in it."

[3] A further reason for restricting the claims to the specified elements is that it is a patent for a combination of elements. In such a claim, if the patentee specifies any element as entering into the combination, either directly by the language of the claim, or by such a reference to the descriptive part of the specification as carried such element into the claim, he makes such element material to the combination, and the court cannot declare it to be immaterial. It is his province to make his own claim, and his privilege to restrict it. If it be a claim to a combination, and be restricted to specified elements, all must be regarded as material, leaving open only the question whether an admitted part is supplied by an equivalent device or instrumentality. Fay v. Cordesman, 3 S. Ct. 236, 109 U. S. 408, 27 L. Ed. 979.

In White v. Dunbar, 7 S. Ct. 72, 119 U. S. 47, 30 L. Ed. 303, the Supreme Court said: "The claim is a statutory requirement, prescribed for the very purpose of making the patentee define precisely what his invention is; and it is unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms. This has been so often expressed in the opinions of this court that it is unnecessary to pursue the subject further. See Keystone Bridge Co. v. Phœnix Iron Co., 95 U. S. 274, 278 [24 L. Ed. 344]; James v. Campbell, 104 U. S. 356, 370 [26 L. Ed. 786]."

There cannot be any serious doubt that, in the gun mount and foundations of the defendant's structure, the car does not remain in transportable position on the railroad when the gun mount is in position for firing. When in that position, the track extending over the pit must, of necessity, have been previously removed. The car, consisting of the girder mounted upon its trucks and running gear, is no longer intact. To the contrary, the gun mount, when assembled with the emplacement, is lifted from the trucks, and the trucks are removed out of the way. It cannot be said that a car is in transportable position when it is not mounted upon its trucks, even though the trucks are near by upon the rails.

A complete answer is found to the plaintiff's contention that the car is still in transportable position, because the girder or body of the car is still maintained in position directly over the railroad, by the fact that, when the mount is in firing position, the railroad is without rails across the pit, and, if the trucks were attached and an attempt made to move the car, either forward or backward, it would fall into the pit. This is not a case in which the doctrine of equivalents is applicable, for the question is upon the elements of the claims of patent, and not upon the question of infringement of the plaintiff's structure by the use of mere mechanical equivalents.

Passing to claim 35, it contains a limitation of "anchoring means for the *car and ordnance intact*, constituting a part of the emplacement and serving to retain *the car and ordnance* in operative position against recoil." In the defendant's structure, there is no anchoring means for the car, and therefore none for the car and ordnance intact. A car, in accordance with both the ordinary and the mechanical meaning, is a vehicle on wheels, and intact means left complete or entire. Therefore, when we use the language, "car and ordnance intact," we mean the transporting car left complete or entire upon its wheels. In the plaintiff's construction, as shown in the drawings and described in the specifications, the trucks and the carrying girder are inseparably united by means of pillars mounted upon the truck frames on opposite ends of the car, and extending through the structure of the girder mount, so as to hold it rigidly in position upon the trucks, but allowing sufficient play for curves and to avoid friction of the parts when moving upon the railway. Moreover, the girder mount is also inseparably connected with the trucks by means of the knuckle joints, by which it is lowered, so that the depressed portion may rest upon the side foundations and be raised again for transportation.

Turning now to claim 37, it contains the limitation, "means for anchoring the transporting car with its ordnance in firing position on the car, said means comprising a fixed emplacement operating to relieve said car of strains under firing conditions of the ordnance." Construing this in connection with the part of the specifications previously quoted in this opinion, which stress the high degree of mobility at all times of the plaintiff's invention, and with the plain meaning of the words, it is evident here, too, that in the transporting car of the defendant's construction, when the girder and gun are anchored to the emplacement in firing position, they no longer have any connection with the trucks, and therefore the transporting car, being disassembled, is not anchored with the ordnance when the latter is anchored and in firing position.

Taking the term "transporting car" as meaning a vehicle on wheels, it is apparent that claim 37 is limited to means for anchoring the car, including the trucks and the gird-

er with the gun mounted thereon, in firing position on the *car;* that is, on the *vehicle on wheels.*

All of the claims in suit, except claims 23 and 42, have the limitation of an ordinary railroad, incapable of resisting the strains of heavy ordnance adapted to be transported thereover. As the prior art was cited by the examiner in disallowing the original claims, which did not include this limitation, the same rule of strict construction must be applied as in relation to transportable position. It is nowhere shown in the defendant's proofs that the defendant's structure was used upon a railroad incapable of resisting the firing strains of heavy ordnance adapted to be transported thereover. While it appears in the defendant's testimony that the ordinary railways in France were of somewhat lighter construction than that at Sandy Hook, it is also shown that at Sandy Hook the gun was fired on the railway tracks without the use of the pit and emplacement, without damage to the tracks, and that in France the guns were nearly invariably used with the pit emplacements, in order to obtain the necessary long range.

It is contended for the plaintiff that the limitation should mean "an ordinary railroad," and that it should be assumed that an ordinary railroad is incapable of resisting the firing strains. There is no testimony to that effect, except that of a witness who testified that he could fasten the track to the car, so it would go if the car went, and under such circumstances necessarily the track would be displaced. One of the defendant's witnesses testified that, if means were devised for clamping the car to the track, the track would probably stand the firing, but with distortion to the track. There is nothing in the defendant's construction, nor in the method of use of the gun mount, to show that the gun was to be clamped to the track; but it was shown that it could be used upon the track where it was usable at all—that is, at an angle of 15 degrees or less, without impairing the track.

In the defendant's construction, the track is not to be used when the gun is raised to an angle of more than 15 degrees, not because of risk to the track, but because the track must be removed from beneath the firing platform in order that the breech of the gun may reach into the pit. The conclusion is that, the claims being restricted to the elements set out, the defendant's structure does not come within the claims relied on in the patents in suit.

It is vigorously contended on behalf of the plaintiff that the claims should be broadly construed, in order to sustain a meritorious invention representing a forward step in the art, and that it must not be limited to the structure described in the specifications, or shown in the drawings. The cases cited for the plaintiff, however, are entirely outside of the rule applied here, in which the claims are strictly construed because of limitations purposely introduced by the applicant to overcome broader claims rejected by the Patent Office. Counsel have argued very earnestly that the evidence shows that the invention was a startling revelation in the art, and that the utility of its combination is thoroughly demonstrated. This line of argument is based upon what developed from the use of the mounted mobile armament constructed by the defendant, which is not relevant, unless the defendant's structure is in accordance with the claims of the patent in suit. If that were assumed, the plaintiff's invention would be entitled to whatever merit such proof carries with it, and to the application of the rule of liberal construction which rightfully follows. But it is found that the defendant's structure was not based upon the combination shown in the claims of the patent in suit, and therefore the major premise is hypothetical and the conclusion is not established.

Luellen and Dawson, in their combination, used no new elements. The cradle-shaped gun carriage, mounted upon its two trucks, for carrying heavy ordnance on railroads, and the fixed emplacements for firing from points on a railroad, were old in the art at the time of filing the application for the patent on November 23, 1915, and no evidence was introduced to carry the invention back of that date, and it is doubtful whether the combination was not anticipated, in view of the publication in the Illustrated London News of November 21, 1914, showing in diagram a 42-centimeter Krupp howitzer used by the Germans in the war. The gun, mounted upon a steel framework supported on trucks upon a railroad, is substantially reproduced in form in the drawings of the plaintiff's patent. The description accompanying the diagram in the publication shows that at the firing point a solidly built platform of concrete is prepared beforehand, in order to support and keep steady the enormous mass of the gun, and hydraulic jacks resting on the foundation hold it in position. If the defendant's structure is such as to read upon the patent in suit, the publication is quite persuasive of the conclusion that the patent is anticipated by the diagram and description in this publication.

[4] If there is novelty in the claims in suit, it is based upon the limitations of transportable position of the car and an ordinary railroad incapable of withstanding the strain of firing. Neither of these limitations apply to the defendant's structure. While the defendant has set up other defenses, including invalidity of the claims relied upon, invalidity of the assignment to the present plaintiff in the substituted bill, lack of notice of infringement, lack of patentability, because the combination claimed is a mere aggregation of elements old in the art, it is unnecessary to discuss them, for the reason that the defense of noninfringement has been established upon sufficient grounds to dispose of the case.

A decree will be entered, dismissing the bill, at the plaintiff's costs.